*In re* SALVADOR WOODS, Minor-Respondent—(THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SALVADOR WOODS, Defendant-Appellant.)

(No. 59652; ▨)

First District (5th Division)—June 21, 1974.

Donald T. Bertucci, of Chicago (Patricia Umsinn, Senior Law Student, and Jody C. Weiner, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and William F. Linkul, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from a judgment terminating a stay of *mittimus* and finding respondent to be delinquent.

In September, 1972, after a previous finding that respondent was delinquent, a stay of *mittimus* was ordered which was in effect in March, 1973, when he was again arrested and a supplemental petition was filed charging him with robbery. A hearing was held in August of 1973, and he was found to have violated the stay of *mittimus* and to be delinquent on the supplemental petition. He was committed to the Juvenile Division of the Department of Corrections.

On appeal, respondent contends that (1) the court improperly refused to suppress the identification testimony of complainant; (2) the evidence was insufficient to prove him guilty of robbery beyond a reasonable doubt; and (3) improper cross-examination deprived him of a fair and impartial trial.

At the hearing on the supplemental petition, complainant Joan Poskozan, called by the State, testified that at about 11 A.M. she was walking on Pierce Avenue, just off Damen Avenue, on her way home from school, when she passed two boys. A moment later, she was struck in the middle of her back and pushed to the ground, face forward. Her wallet, some identification cards and photographs were taken from her. She saw the faces and noticed the clothing of her attackers. When she got up, a police car approached, which she stopped. She informed its occupant, Officer Fabian, of the incident. After she went home, she was called outside by the police and was shown two boys in a car.

At this point in her testimony, when she was asked to identify respondent, a motion to suppress her identification was made and, at the hearing held on this motion, she testified as follows: Her assailants fled across Pierce to Hoyne, and she described them to Officer Fabian as being black, both about 18 years of age, weighing approximately 150 to 160 pounds and about 5'8" tall, although one may have been shorter. She noticed that one wore a long, dark red coat and that the other wore

a short jacket. Later, when called from her house by Officer Fabian, she was asked in the presence of Officers Zito, Dugan and Fabian and respondent's mother to look in the back seat of the unmarked vehicle, and in response to the officers' questions, "Do you know them?"; "Do you recognize them?"; she answered, "It looked like the two who could have robbed me." After looking at the boys in the car, she could have moved her head laterally from right to left and left to right, although she did not remember doing so. When she saw respondent in the car, he was wearing a long, red coat and a brown felt hat.

Jessie Mae Woods, respondent's mother, called by him, testified she saw him in front of her apartment in a marked police car with Officer Fabian, who told her that an incident had occurred and that her son was being taken to be viewed by some people. An unmarked car arrived, and respondent was moved into that vehicle and driven about a block away. She followed in her car and was present when a young girl was brought out to the other car and she saw the girl look inside the car and, after looking at an officer, the girl shook her head from left to right in a lateral movement. She then approached Officer Zito and asked why they were holding respondent, after the girl had failed to identify him. Zito said she could take him home, but as her son started to walk away, Zito searched his pockets and found a hard card in his wallet, having the name of "Grey", and Zito then said, "We have to take your son to the station for further questioning."

Officer Fabian, called by the State, testified that in response to a radio call received at about 11 A.M., he took information concerning the robbery from complainant and then drove to the corner of Schiller and Hoyne, where he parked to write out his report. There he noticed two youths, one walking north on Hoyne and the other walking east on Schiller. He stopped them and put them in the car "because at that time in the morning, it looked like they were out of school." Later, about 11:40 A.M., when Officers Zito and Dugan arrived, the youths were transferred to their unmarked car and driven to complainant's home for possible identification. When he observed the two boys, respondent was westbound on Schiller, and the other boy was northbound on Hoyne. Brown, brimmed hats and maxi-coats were not unusual apparel for black youths living in that area.

Officer Gregory Zito, called by the State, testified that he was northbound on Hoyne with Dugan when he observed two male Negro youths running from a fallen girl. His view was clear and unobstructed. One was a little taller than the other—with the short one wearing a maroon maxi-coat and a brown, brimmed hat, and the other wearing a black leather jacket. They gave chase, but the boys disappeared down an

alley. Shortly thereafter, he received a call from Officer Fabian, who stated he had two boys in his car, and when he and Dugan arrived, he saw they were the same boys he had seen running away earlier. The youths were taken to the complainant, and she identified them as her attackers. He later identified respondent as one of the youths he had seen running from the fallen girl. When he saw the youths running from the fallen girl, she was on the ground on the north side of Pierce.

The court denied the motion to suppress complainant's identification and, when the hearing on the supplemental petition resumed, she testified respondent was one of the persons that she identified in the police car. She also stated that from the middle of the block on Pierce one could not see to the middle of the block on Hoyne. (Police Officer Zito had testified that when traveling on Hoyne, he saw two boys running from a girl who had fallen on Pierce.)

Richard Johnson, called by the State, testified that at about 11 A.M. he was standing on the corner of Hoyne and LeMoyne when he saw two boys running down the street, one running south on Hoyne and the other west on LeMoyne. He identified respondent as one of the boys. Subsequently, he talked with Officer Zito and told him he had seen two boys running down the street.

Officer John Dugan, called by the State, testified that he was with Officer Zito and saw a woman had been knocked down and that two men started to run away from her. He identified respondent as one of them.

Respondent testified that he was not involved in the robbery and was not on Pierce Avenue on that day. As we read his testimony, at the time of the robbery (about 11 A.M.) he was either in the Tuley High School lunchroom or in a dice game in a building next to the school. His sister testified that she saw him in the lunchroom about 11:05 A.M., and Herbert Weston testified that respondent was in the dice game at 10:35 A.M. and that he did not see him leave until 11:35 A.M. Respondent also testified that he was arrested as he was about to enter his house and that he did not see Thomas Spencer (apparently the other boy arrested with him) on that day until after he was stopped by the policeman when Spencer walked up to them. Spencer did not testify.

OPINION

Respondent presents several theories in support of his contention that the court erred in denying the motion to suppress the identification testimony of complainant. In one of these, he argues that the identification was the result of an illegal arrest and detention.

In this regard, we note that a law enforcement officer may, without a warrant, take a minor into temporary custody where, with reasonable

cause, the officer believes the minor to be delinquent, otherwise in need of supervision, neglected, or dependent (Ill. Rev. Stat. 1973, ch. 37, par. 703—1), and that a minor otherwise in need of supervision is any minor subject to compulsory school attendance who is habitually truant (par. 702—3(b)).

Officer Fabian testified he stopped the two boys "because at that time of the morning it looked like they were out of school. So I put them in the car." Respondent argues that although Fabian may have believed he was truant, there is no evidence in the record indicating that Fabian believed he was neglected, dependent, delinquent, or an habitual truant and, under those circumstances, he contends that Fabian lacked the reasonable cause required by statute for the initial custodial detention.

The State contends that Fabian had probable cause. In its brief here, it states "his attention was drawn to them (the two boys) initially because it was a school day and they were not in school." The brief goes on to say, "In addition, they matched the description given by the victim of her assailants and so Fabian stopped them and placed them in his squad."

As we view the record, it appears that Fabian did have a description of the two attackers when he first observed respondent and the other boy, who were walking towards each other on intersecting streets. However, in his testimony, he stated that he stopped them because "it looked like they were out of school." Thus, it appears that the original detention was not the result of the descriptions in his possession but rather, because of his belief that the two boys should have been in school. The only indication in the record in support of the State's contention that the descriptions might have had some relation to the detention appears in the cross-examination of Fabian when, in answer to the question, "Now, what led you to believe that they (the two boys) were associated with one another?"; he answered, "It just didn't look right, and taking that report." We cannot accept this answer as indicative of the fact that the descriptions of the boys were the basis of their detention.

■■ Moreover, a general description is insufficient to provide the probable cause necessary to justify an arrest unless it is supported by other relative facts and circumstances known to the arresting officer. *People v. Mills*, 98 Ill.App.2d 248, 240 N.E.2d 302.

The only possible supportive testimony appears to be that respondent (1) was in the vicinity of the crime, which we believe is negated by the fact that he lived in the area and, in fact, was stopped by the police as he was entering his house; and (2) he was wearing a maxi-coat and a brown, brimmed hat, which has little if any value as support, in view

of Fabian's testimony that they were not unusual pieces of apparel for a black youth in that area.

In further response, the State asserts that, assuming arguendo, that Officer Fabian didn't have traditional probable cause to arrest, he had sufficient grounds to temporarily question respondent without arresting him, pursuant to section 107—14 of the Code of Criminal Procedure. (Ill. Rev. Stat. 1973, ch. 38, par. 107—14) which, in pertinent part, provides that such investigative stops are authorized where the officer reasonably infers from the circumstances that the person is about to commit or has committed an offense, which is defined in section 102—15 of the same Code (ch. 38, par. 102—15) as any violation of a penal statute of the State.

■■ The State then urges that respondent, by not attending school on a school day, was in violation of the provisions of article 26 of the School Code (Ill. Rev. Stat. 1973, ch. 122, par. 26—1 *et seq.*) and, more particularly, section 26—5 which permitted Fabian to stop him and inquire as to his absence from school. We disagree for the following reasons: First, all of the penal provisions of article 26 are aimed at those individuals having "custody or control of a child" and not at the child who refuses to attend school; second, article 26—5 gives truant officers, not police officers, the power to investigate cases of truancy and non-attendance; and third, even assuming Fabian had the right to stop respondent and question him concerning his absence from school, there is no evidence in the record indicating that Fabian asked any questions of respondent concerning this absence or, for that matter, about anything else. The record discloses he merely stopped the youths and put them in the police car. We note also that at the time of the robbery complainant was on her way home from school and, for all that Fabian knew, respondent may have had good reason or proper excuse for not being in school, particularly in view of the fact that he was entering the house where he lived when arrested.

■ ■ A police officer has probable cause to arrest a person without a warrant when the facts and circumstances within his knowledge and of which he has reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty. (*People v. Fisher*, 2 Ill.App.3d 7, 276 N.E.2d 103.) Whether a police officer had probable cause to arrest depends on the totality of the facts and circumstances in the given case.

■■ Our analysis of the evidence leads us to conclude that Officer Fabian at most had only a general description of the assailants, which

was not supported by other relevant facts and, under the facts and circumstances here, we believe that the description was insufficient to justify the arrest of respondent. (*People v. Mills, supra.*) Furthermore, from our consideration of the totality of the evidence, we are of the opinion that Officer Fabian did not have probable cause to arrest respondent.

The State further contends that even though the arrest might be considered illegal, that it did not necessarily follow that the identification testimony of complainant was inadmissible. It cites *People v. Pettis*, 12 Ill.App.3d 123, 298 N.E.2d 372. There, defendant was arrested on charges of burglary and impersonating an officer. While in illegal custody, a photograph was taken and kept on file which subsequently was shown to the victim of and a witness to another crime, who identified defendant from the photograph as the person who committed the other crime. The trial court rejected the identification testimony because it was based on the photograph taken as the result of the previous illegal detention. This court reversed, holding the facts and circumstances established that the illegal arrest was not prompted by a desire for the photographs, and concluded therefore that the identification testimony should have been admitted because it "was not acquired by exploiting defendant's illegal arrest."

■■ In determining whether the evidence sought to be suppressed was the direct result of the original illegal act, the *Pettis* court quoted from *Wong Sun v. United States*, 371 U.S. 471, 488, 9 L.Ed.2d 441, 83 S.Ct. 407, where the Supreme Court stated that the "\* \* \* question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

The State argues here that the in-court identification of respondent cannot be classed as a direct result of the illegal arrest, since the arrest and the initial identification by complaint took place 6 months before the in-court identification. We do not find this argument persuasive. We note that at the time of her initial identification complainant, when asked whether she recognized the boys, stated, "It looked like the two who could have robbed me", and at the time of her in-court identification, she pointed out respondent as one of the persons she had seen in the police car at the time of her initial identification. In *People v. Bean*, 121 Ill.App.2d 332, 257 N.E.2d 562, the court stated, at page 335:

> "The exhibition of defendant to the victim was a direct consequence of the admittedly unlawful detention of his person. Indeed, the identification would not otherwise have occurred.

We hold the identification of defendant to be a product of the unlawful seizure of his person and consequently all testimony relating thereto improperly admitted into evidence against him. Further, all subsequent identifications of defendant by the victim, including in-court identification, are directly traceable to the unlawful detention of defendant."

■■ We believe that the in-court identification was far less than positive and the direct result of the illegal arrest and that the 6 months lapse of time did not purge the identification of its primary taint. In view thereof, we conclude the court erred in refusing to suppress the identification testimony of complainant.

Respondent also argues that he was not proved delinquent beyond a reasonable doubt. The quantum of proof required in a juvenile delinquency proceeding is the same as that required for conviction in a criminal case. (*In re Urbasek*, 38 Ill.2d 535, 232 N.E.2d 716.) We note section 701—4 and 704—1 of the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, pars. 701—4 and 704—1) provides that adjudicatory hearings on petitions of the type involved here are to determine whether allegations of delinquency are proved beyond a reasonable doubt.

Here, complainant did not see which of the two persons knocked her down. She did not say that more than one person knocked her down nor could she say which of the two removed the articles from her possession. She saw two boys running away from her, and when she viewed the boys in the police car, she said, "It looked like the two who could have robbed me," and her in-court identification of respondent was that he was one of the persons she had identified in the police car. Officers Zito and Dugan did not see either boy knock her down; they saw two boys running from where complainant had fallen, and they later identified the two boys in the police car as those they had seen running from the scene. Richard Johnson saw two boys running but did not see the girl knocked down. It is also noted that the stolen articles were not recovered.

Thus, we see that the only evidence of involvement of respondent was his presence and the fact that he ran away. We believe that such evidence is slight proof, if any, that respondent was the person who either knocked down or robbed complainant and, in any event, it falls far short of proof beyond a reasonable doubt.

Neither do we believe, as the State suggests, that the proof was sufficient to show accountability on the part of respondent by his failure to offer resistance or objection to the robbery. Section 5—2 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 5—2) provides that a person is legally accountable for the conduct of another when:

"(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

■■ Again, we note that the only evidence of respondent's involvement was his presence and flight. There is no other evidence in the record to indicate intent to promote or facilitate the commission of the offense or that he solicited, aided, abetted, agreed to or attempted to aid the person who committed the offense.

■■ Mere presence at the scene of the crime is insufficient to establish accountability (*People v. Rudolph*, 12 Ill.App.3d 420, 299 N.E.2d 129), and we believe that presence at the scene together with flight, in the absence of other circumstances indicating a common design to do an unlawful act, does not establish accountability.

For the reasons stated, the judgment will be reversed. In view thereof, it will not be necessary to consider the remaining matters raised by respondent.

Reversed.

DRUCKER and LORENZ, JJ., concur.